[Cite as *Straley v. Morris*, 2026-Ohio-213.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

| | |
|---|---|
| Chester Straley, et al., | Court of Appeals No. L-25-00007 |
| Appellants | Trial Court No. CI0202101602 |
| v. | |
| Gregory Morris | **DECISION AND JUDGMENT** |
| Appellee | Decided: January 23, 2026 |

* * * * *

John Brooks Cameron, Esq., and Christopher Jankowski, Esq.,
attorneys for appellants.

Samuel E. Gold, Esq., attorney for appellee.

* * * * *

**SULEK, J.**

{¶ 1} Appellants Chester and Sue Straley appeal the judgment of the Lucas

County Court of Common Pleas, following remand, which ordered appellee Gregory

Morris to pay them $9,000 in damages on their claims of battery, civil action for injury by

criminal act, intentional infliction of emotional distress, and loss of consortium. For the following reasons, the trial court's judgment is affirmed.

## I. Factual Background and Procedural History

{¶ 2} This is the second time this case has been before the court. In the first appeal, *Straley v. Morris*, 2024-Ohio-3043, ¶ 2-19 (6th Dist.) this court recounted the facts as follows:

> On November 15, 2020, Chester Straley was shopping at a Save-A-Lot store in Toledo, Ohio, when he encountered two women who were not wearing their masks during the height of the Covid-19 response. Chester asked the two women to put on their masks. The women responded by yelling racial obscenities at him. The confrontation continued at the checkout line, with one of the women threatening that someone was going to "take care of [his] ass" when he left the store.

> As Chester exited the store and went to his car, a truck came speeding into the parking lot. The two women pointed the truck towards him. The driver of the truck, appellee Gregory Morris, approached Chester and pulled out a handgun. Morris pointed the gun at Chester's head and said that he was going to "blow your white-ass head off." Morris also said that Chester should not mess with an ex-marine recon force. He then lowered the gun and shot Chester in his left calf.

> Chester fled to his home where he called 911. Ultimately, he went to the emergency room to receive treatment for his gunshot wound.

> On March 23, 2021, Chester and Sue Straley filed a six-count complaint against Morris, Save-A-Lot, LTD., Moran Foods, LLC, and Save-A-Lot Grocery Store. The complaint raised counts of battery, civil action for injury by criminal act, and intentional infliction of emotional distress against Morris, and a count of negligence against Save-A-Lot. The complaint also sought punitive damages and compensation for loss of consortium. The Straleys later dismissed all the defendants except Morris.

> Morris, despite receiving service of the complaint and appearing for a deposition, never responded to the complaint. Thus, default judgment

2.

was entered against him on January 17, 2023. Morris moved to vacate the default judgment, which the trial court denied. The matter then proceeded to a damages hearing via video conference.

At the damages hearing, Dr. Kenneth Davis testified on behalf of the Straleys. Davis is a clinical psychologist who began treating Chester shortly after the shooting incident and diagnosed him with post-traumatic stress disorder ("PTSD"). Davis testified that he had not seen Chester in over a year but had an upcoming appointment with him later that week. According to Davis, Chester reported that his sleep was affected, that he was nervous to go out in public, and that he was having negative thoughts about himself. Davis opined to a reasonable degree of psychological probability that Chester's PTSD diagnosis would continue through the rest of his life.

On cross-examination, Davis testified regarding his notes that he took during his sessions with Chester. Many of the notes alluded to Chester's frustration with the justice system, which he viewed to be slanted along racial lines against him, and his perception that the police and the court system did not want to protect him for fear of being labeled racist because he was white and Morris was black.

Chester testified next. He stated that it was very painful when he got shot, and the wound took about two months to heal. He still has residual physical effects from the shooting, in that he will feel a sharp pain in his calf and his leg will become weak. Chester testified that he can no longer walk long distances, he has a slight limp, and it is hard to walk up hills or climb steps. Mentally, he is a "wreck." He is nervous around loud noises, is afraid to go out in public alone, no longer goes to the fair, the mall, the theater, or school functions, and has night terrors so he no longer sleeps in his bed with his wife and as a result is no longer physically intimate with her.

During cross-examination, Chester was asked what he said when he first walked into the Save-A-Lot. Counsel objected on the grounds that it was irrelevant to the damages hearing because liability was already established through the default judgment. The trial court overruled the objection, reasoning "Liability is not the issue, but the facts and circumstances are important to me. If I'm going to determine from what happened here something that is related to Mr. Morris's actions I need to understand the whole story. I think this is completely relevant. So I am

3.

trying to figure out the entire big picture here." Chester then denied using any racial slurs during the altercation.

Chester also testified regarding a recent case where he was originally charged with a safe school assault stemming from a dispute that happened at his daughter's school where he allegedly hit someone. He claimed that he was set up by Morris's niece, then the video of the incident mysteriously disappeared, and he was forced to plead guilty to disorderly conduct.

During the line of questioning, Chester became highly agitated, believing that Morris's counsel was accusing him of being a racist. The trial court interrupted the proceedings for Chester to regain his composure.

Counsel then asked Chester about a prior injury in 2012, following which he reported that he had difficulty sleeping, was unable to perform household chores, and suffered from depression that prevented him from going outside. On redirect, he clarified that the symptoms occurred following a shoulder surgery. He has since fully recovered from the surgery and was not experiencing any of those symptoms at the time of the shooting incident.

Sue Straley testified that the shooting dramatically changed her husband. He now is very withdrawn and no longer does fun things with her or with his friends, he rarely talks to her anymore, and they have stopped being physically intimate. She explained that she has had to reduce her hours at work so that she can be home to do more of the maintenance on the house and the car. She also testified that the shooting has changed Chester's relationship with his children. He also suffers from night terrors and is incapable of being out in public for more than 15 minutes at a time.

The Straleys then rested, and Morris called his granddaughter, Kelmyia Morgan, as his first witness. The Straleys objected to Morgan's testimony on the grounds of relevance given that liability had already been established. The trial court again overruled the Straleys' objection, reasoning "If in the end it has no relevance on the issue at hand, which is damages, then I'll ignore the testimony, but I have no idea what this is related to at this time." Morgan proceeded to testify that Chester came into the store demanding that Morgan wear her mask and informing the clerk not to serve Morgan if she did not put on her mask. An argument ensued during which Morgan threatened to "beat his ass" and Chester called her a "disrespectful black n***er bit**." Morgan testified that Chester

confronted her sometime after the incident and threatened that she and the other woman who was with her "will pay."

Morris was the final witness to testify. Morris began testifying regarding the circumstances of the shooting when the Straleys objected on the nature of the leading questions. The trial court overruled the objection, commenting that "This is a damages hearing. I can separate. Just relax." Morris then testified that Chester verbally threatened him, used racial slurs, and spit on him before he fired at the ground near Chester's feet.

At the end of the hearing, counsel requested $600,000 in compensatory damages for Chester Straley, $300,000 in compensatory damages for Sue Straley, and $500,000 in punitive damages.

The trial court, on the record, reviewed the evidence. It found Dr. Davis's testimony "only marginally compelling" because he did not have Chester as a patient prior to the incident and had only limited information regarding Chester's psychological background. The court also considered whether Chester's conduct displayed during the hearing was a consequence of the shooting incident, along with the idea that Chester raised similar complaints following his shoulder injury in 2012. It then considered the "bottom line" question of who Chester was before the shot, who he was after, and how it has changed and impacted him. The court determined,

> There's no real justification for Mr. Straley's behavior at [Save A Lot]. . . .there is no real need for Mr. Straley to interject into a perceived wrong by him of the way someone else in our society was wearing their mask during COVID.
> The COVID situation caused people to do lots of different things that really they should have not concerned themselves with. The appropriate behavior in that situation would have been for Mr. Straley to just remove himself from the situation and go shop at another store, or come back at a later time, as opposed to confront somebody in public about the way they were wearing their masks.
> If Mr. Straley had a displeasure with the way someone was acting it was his responsibility to remove himself from the situation. However, that does not change Mr. Morris's responsibility to not discharge a weapon, pull a weapon, point a weapon, or anything like that, at another individual just because he was wrong in the way he approached the situation.

I understand Mr. Morris's desire to protect his family members, and there is complete understanding of that, but nonetheless, he did fire his weapon.

So all of that being said, a $600,000 request for Mr. Straley is absurd. A $300,000 request for Mrs. Straley is absurd. And $500,000 of punitive damages is even more absurd. 1.4 million dollars for what happened here is completely out of the question.

That is just – Mr. Straley, I hope you weren't thinking that that's going to be a great big payday coming your way, because that is completely absurd.

I do feel that you are due an award of damages, because you should not have been shot in this situation. There is no justification for that. A parting of the ways after some terse words would have been about the most appropriate thing to happen here. Mr. Straley goes on his way, and then Mr. Morris, you go on your way. But there is absolutely no reason a gun had to be fired in this situation.

So, I will award Mr. Straley $6,000.00. I will award Mrs. Straley $3,000.00. And there will not be any punitive damages. That's a total of a $9,000.00 award. I do believe that is generous in this situation.

Lots of people acting bad like here does not justify anything approaching what was requested in this – this $600,000, $300,000, and $500,000. As I indicated, completely absurd.

On May 18, 2023, the trial court entered its judgment memorializing the $9,000.00 award.

{¶ 3} On appeal, this court reversed the judgment of the trial court, concluding that "because of the default judgment, Morris is 100 percent liable for the Straleys' injuries and any attempt to reduce Morris's liability on account of Chester's own bad conduct in causing the incident is improper," and thus the trial court erred when it considered evidence of causation during the damages hearing following the default judgment. *Id.* at ¶ 23-24. This court reasoned,

6.

> Despite its repeated assertions that it could separate the issue of damages from the issue of causation, the record clearly indicates that the trial court based its award on Straley's conduct in causing the incident. In particular, the court gave little if any consideration to the evidence of the harm suffered by the Straleys, instead choosing to focus on the lack of justification for Chester's actions in initiating the dispute and not removing himself from the situation. Further, the court concluded that "[l]ots of people acting bad like here does not justify anything approaching what was requested.

*Id.* at ¶ 24. The matter was then remanded to the trial court "for determination of the Straleys' damages based on the evidence they produced at the damages hearing." *Id.* at ¶ 27.

{¶ 4} Upon remand, the trial court awarded the same amount of damages. In its December 12, 2024 judgment entry, the trial court explained:

> Plaintiffs herein sought $600,000.00 in damages for Chester Straley, $300,000.00 in damages for Sue Straley, and $500,000.00 in punitive damages. Importantly, however, Plaintiffs provided no evidence whatsoever detailing any specific amount of damages to which they may be entitled. Plaintiffs established through the testimony of Dr. Kenneth Davis that Chester Straley suffered from post-traumatic stress disorder ("PTSD") as a result of being shot by Defendant. Dr. Davis indicated that PTSD is a lifelong condition, but he also indicated that at the time of the damages hearing, Chester Straley had not sought treatment from him for roughly a year. Importantly, Plaintiffs did not establish through the testimony of Dr. Davis or otherwise either the amount of money expended on Dr. Davis' services, nor any estimate of the amount of money they would need to expend (if any) on future treatment. The only fact established regarding any diagnosable condition Chester Straley suffered from as a result of Defendant's actions was that he had PTSD, and such PTSD is a lifelong condition. No evidence outlining the details of required treatment – specifically, the cost thereof – was presented by Plaintiffs.

> Additionally, Plaintiffs established through both the testimony of Chester Straley and Sue Straley that their marital relationship changed subsequent to Defendant shooting Chester. Plaintiffs also presented

evidence indicating Chester Straley's life experiences, disposition, etc. had changed significantly as a result of Defendant's actions. However, evidence was also presented at the hearing indicating Chester Straley vacillated in and out of his current disposition for a multitude of reasons in the years prior to his encounter with Defendant. Put simply, while it certainly does appear Mr. Straley was impacted by Defendant's actions – as would be expected – the record is unclear as to the full extent Mr. Straley's condition truly changed from prior to Defendant's actions.

It is clear Plaintiffs find themselves in a regrettable situation. However, they fail to establish with evidence any type of monetary figure which may approximate the damages requested. Plaintiffs' counsel made what amounts to a bald ask of $600,000.00 and $300,000.00 in damages to Chester Straley and Sue Straley, respectively, and $500,000.00 in punitive damages, but no information was presented evincing the basis for these figures. The Court certainly would have entertained and considered such evidence; that is the purpose of a damages hearing. What was presented at the hearing was evidence outlining real life changes which *may* have resulted from Defendant's actions. However, Plaintiffs failed to present evidence indicating the damages figures sought were tied in fact to the damages they actually sustained.

Based on the record before it, the Court has no basis to award the total damages figure sought by Plaintiffs. There is no evidence of specific figures from which to fashion a specific damages award, and Plaintiffs effectively ask the Court to speculate as to the full damages figure. The Court is therefore left only with the fact that Plaintiffs were damaged; the degree thereto was not proven at the damages hearing. Because Plaintiffs were undoubtedly damaged in some manner, the Court awards $6,000.00 in damages to Chester Straley and $3,000.00 in damages to Sue Straley. No punitive damages are awarded.

## II. Assignments of Error

{¶ 5} The Straleys timely appeal the trial court's December 12, 2024 judgment entry, asserting two assignments of error for review:

1. The trial court erred when it awarded Chester Straley only $6,000.00 and Sue Straley only $3,000.00.

8.

2. The trial court erred when it declined to award punitive damages.

### III. Analysis

### A. Compensatory Damages

{¶ 6} In their first assignment of error, the Straleys contend that the trial court erred when it awarded only $6,000.00 to Chester and $3,000.00 to Sue in compensatory damages for noneconomic loss.

{¶ 7} The parties disagree on the appropriate standard of review. The Straleys contend that we should review an inadequate damages determination for an abuse of discretion. Morris, on the other hand, argues that the manifest weight standard should be applied.

{¶ 8} "Because the award of damages is a discretionary matter, we will not reverse a trial court's decision regarding its determination of damages absent a showing that the trial court abused its discretion." *Bank of America, N.A. v. Goetz*, 2020-Ohio-3751, ¶ 14 (6th Dist.), quoting *Reinbolt v. Kern*, 2009-Ohio-3492, ¶ 38 (6th Dist.); *Quest Workforce Solutions, LLC v. Job1USA, Inc.*, 2018-Ohio-3304, ¶ 14 (6th Dist.). An abuse of discretion connotes that the trial court's attitude was unreasonable, arbitrary, or unconscionable. *Reinbolt* at ¶ 38, citing *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983).

{¶ 9} "Compensatory damages are intended to make whole the plaintiff for the wrong done to him or her by the defendant." *Fantozzi v. Sandusky Cement Prod. Co.*, 64 Ohio St.3d 601, 612 (1992). They include compensation for both economic and

9.

noneconomic loss. *Smith v. Perkins*, 2024-Ohio-1419, ¶ 39 (3d Dist.), citing *Brooks v. Montgomery Care Ctr.*, 2014-Ohio-4644, ¶ 8 (1st Dist.); *Fantozzi* at 612. "Economic loss" refers to pecuniary harm such as lost wages or salaries, expenditures for medical care or treatment, and "[a]ny other expenditures incurred as a result of an injury or loss to person or property." R.C. 2315.18(A)(2). "Noneconomic loss," on the other hand, "means nonpecuniary harm . . . including, but not limited to, pain and suffering, loss of society, consortium, companionship, care, assistance, attention, protection, advice, guidance, counsel, instruction, training, or education, disfigurement, mental anguish, and any other intangible loss." R.C. 2315.18(A)(4).

{¶ 10} In this case, the Straleys only discuss noneconomic losses, and make no argument that they are entitled to economic losses. Specifically, as to Sue, the claim for loss of consortium is by definition a noneconomic loss. As to Chester, the Straleys argue for a greater award because "Chester has suffered physically and mentally because of [Morris's conduct] and has been diagnosed with PTSD." They cite (1) the pain Chester experienced when he was shot, (2) the physical issues he continues to experience in his leg, including pain, weakness, and walking with a limp, (3) PTSD and other mental effects, (4) and night terrors that prevent him from sharing a bed with Sue. All of these are noneconomic losses.

{¶ 11} "One cannot deny that noneconomic-damages awards are inherently subjective and difficult to evaluate." *Arbino v. Johnson & Johnson*, 2007-Ohio-6948, ¶ 69. "The assessment of such damage is, however, a matter solely for the determination of

10.

the trier of fact because there is no standard by which such pain and suffering may be measured." *Fantozzi* at 612; *Smith v. Perkins* at ¶ 39. As stated by the Tenth District,

> An appellate review of the adequacy of a trial court's award for noneconomic damages, or pain and suffering, is difficult because no specific yardstick, or mathematical rule exists for determining pain and suffering. Rather, the finder of fact makes a "human evaluation" of all the facts and circumstances involved. In reviewing the reasonableness of a pain and suffering award, a court may consider awards given in comparable cases as a point of reference, but ultimately must evaluate each case in light of its own particular facts. Given the difficulty in calculating pain and suffering damages, reviewing courts generally defer such determinations to the trier of fact, and are reluctant to substitute their judgment. Indeed, in no other element of damages is there so wide a latitude for awards as in pain and suffering.

(Internal citations omitted for readability.) *Kelly v. Northeastern Ohio Univ.*, 2008-Ohio-4893, ¶ 8 (10th Dist.), quoting *Hohn v. Ohio Dept. of Mental Retardation and Dev. Disabilities*, 1993 WL 524857, *3 (10th Dist. Dec. 14, 1993)

{¶ 12} Here, the Straleys contend that the trial court's award for noneconomic losses was unreasonably low when compared to other cases. For example, in *Doepker v. Willo Security, Inc.*, 2008-Ohio-2008 (5th Dist.), the trial court awarded $34,000,000 in compensatory damages and $18,000,000 in punitive damages to a person who was shot by a private security guard. The Straleys also cite two "less severe" cases, such as *Darfus v. Clark*, 2013-Ohio-563 (5th Dist.), in which the Fifth District upheld an award of $100,000 for noneconomic loss to a dog-bite victim, and $15,000 to his wife for loss of consortium, and *Hilgefort v. Stewart*, 2011-Ohio-253, ¶ 2 (3d Dist.), in which the Third

11.

District affirmed a $20,000 award for pain and suffering where the victim was picked up in the air and "slamm[ed]" to the floor with "great force and violence."

{¶ 13} While they recognize that each case is unique, the Straleys cite these other cases "to show that less egregious conduct can have substantially more in reasonable compensatory damages." They maintain, "Simply put, a $6,000.00 award for experiencing a gun getting pointed at his head and getting shot in the leg is unreasonable when compared to another gunshot case, regardless of the difference in severity." This argument, however, juxtaposes the outrageousness of the offender's conduct with the actual harm suffered by the victim. Only the latter is relevant to determining compensatory damages and it must be proven with evidence.

{¶ 14} In this case, the trial court did not regard the Straleys' evidence of their injuries as compelling. It noted Chester's PTSD diagnosis, but found that he had not sought treatment for over a year. It also found that Chester had "vacillated in and out of his current disposition for a multitude of reasons in the years prior to his encounter with [Morris]," and it was "unclear as to the full extent Mr. Straley's condition truly changed from prior to [Morris's] actions." It concluded that it was "left only with the fact that Plaintiffs were damaged; the degree thereto was not proven at the damages hearing." It therefore awarded $6,000.00 to Chester and $3,000.00 to Sue because they were "undoubtedly damaged in some manner."

{¶ 15} Considering the record from the damages hearing, the trial court's decision is not unreasonable, arbitrary, or unconscionable. The majority of the evidence regarding the extent of the Straleys' injuries came from their own testimony. Even Dr. Davis relied solely on information self-reported by Chester concerning the extent of his problems—Dr. Davis did not have Chester as a patient before the shooting and had no knowledge of any pre-existing conditions. The trial court, however, was unconvinced as to the full extent of Chester's injuries caused by Morris, and it was in the best position to "view the demeanor, attitude, and credibility of each witness." *NW Ohio Services III, LLC v. Thames*, 2024-Ohio-5307, ¶ 23 (6th Dist.); *Davis v. Flickinger*, 77 Ohio St.3d 415, 418 (1997). In this case, the trial court's determination is supported by Chester's concession that he claimed similar injuries when he filed for disability benefits in 2013 based on a work accident that occurred in 2006. Its award of $9,000.00 in compensatory damages to the Straleys, therefore, is not an abuse of discretion.

{¶ 16} Alternatively, the Straleys contend that the trial court's decision was an abuse of discretion because the amount of the award remained the same after the remand. They argue that "[t]he trial court's failure to alter the damages award, despite explicit appellate instructions to disregard testimony that clearly impacted on the original award, suggests a disregard of this Court's directives, raising serious concerns about an error of law or a failure to adhere to appellate guidance." They maintain that the decision appears arbitrary and unreasonable, "especially considering how low the award is bearing in mind the severity of the case."

13.

**{¶ 17}** As to the contention that the trial court disregarded this court's directives, the presumption of the regularity of the proceedings applies.

> A general principle of appellate review is the presumption of regularity, that is, a trial court is presumed to have followed the law unless the contrary is made to appear in the record. Thus, the court of appeals generally presumes regularity in the proceedings below, and all presumptions will be indulged in support of the validity and correctness of the proceedings below. Also, in appeals, all reasonable presumptions consistent with the record will be indulged in favor of the legality of the proceedings below. The law presumes that the decree or judgment was made upon proper grounds; that the court below applied the law correctly; that a trial judge performed one's duty and did not rely upon anything in reaching a decision upon which one should not have relied; and that the action below was justified.

*State v. Rutledge*, 2025-Ohio-4573, ¶ 84 (6th Dist.), quoting *State v. Phillips*, 2022-Ohio-1262, ¶ 24 (2d Dist.), quoting 5 Ohio Jur.3d, Appellate Review, § 454. Notably, the trial court's judgment entry explicitly acknowledged the remand and the instruction not to engage in a comparative fault analysis. And although it reached the same damages award as before, it provided a different rationale, which indicated that it was, in fact, complying with this court's directive. Finally, while the Straleys consider the award to be low relative to the severity of the case, as discussed above, the trial court's award and reasoning supporting its award was not unreasonable, arbitrary, or unconscionable.

**{¶ 18}** Accordingly, the trial court's damages award was not an abuse of discretion. The Straleys' first assignment of error is not well-taken.

14.

## B. Punitive Damages

**{¶ 19}** In their second assignment of error, the Straleys argue that the trial court erred when it failed to award punitive damages.

**{¶ 20}** "[P]unitive damages are available for personal injury or property loss caused by malice or 'intentional, reckless, wanton, willful and gross acts.'" *Whetstone v. Binner*, 2016-Ohio-1006, ¶ 16, quoting *Rubeck v. Huffman*, 54 Ohio St.2d 20, 23 (1978). "The purpose of punitive damages is twofold—to punish the tortfeasor and to deter similar conduct." *Id.* at ¶ 15, citing *Moskovitz v. Mt. Sinai Med. Ctr.*, 69 Ohio St.3d 638, 651 (1994). "In other words, deterrence is intended to be both specific to a particular tortfeasor and general as an example to others." *Id.*

**{¶ 21}** The Straleys contend that this court should review the denial of punitive damages for whether it is against the manifest weight of the evidence. Indeed, in *Walker v. Insane Clown Posse, LLC*, 2019-Ohio-5150 (6th Dist.), this court stated, "We review the award or denial of punitive damages as whether it is against the manifest weight of the evidence." *Id.* at ¶ 34, citing *Hofner v. Davis*, 111 Ohio App.3d 255, 259 (6th Dist.1996). In *Walker*, however, the issue was whether evidence existed to support a finding of actual malice. No such issue is present here as the record demonstrates that Morris acted with actual malice in that the state of mind regarding his conduct is characterized by either "hatred, ill will or a spirit of revenge," or "a conscious disregard for the rights and safety of other persons that has a great probability of causing substantial harm." *Preston v. Murty*, 32 Ohio St.3d 334 (1987), syllabus.

15.

{¶ 22} While the Straleys may have satisfied their burden to establish entitlement to punitive damages by clear and convincing evidence, "an award of punitive damages is not automatic." *Whetstone* at ¶ 20. "Even when a plaintiff can establish entitlement to punitive damages, whether to impose punitive damages, and in what amount, is left to the trier of fact." *Id.* This court, therefore, will review the trial court's decision not to impose punitive damages for an abuse of discretion. *See Olive Oil, LLC v. Cleveland Electric Illuminating Co.*, 2025-Ohio-6, ¶ 15 (8th Dist.) ("The decision whether to award punitive damages is within the trial court's discretion and, absent an abuse of discretion, the court's ruling will be upheld."); *Daddario v. Rose*, 2024-Ohio-5883, ¶ 56 (5th Dist.); *Besancon v. Cedar Lane Farms, Corp.*, 2017-Ohio-347, ¶ 30 (9th Dist.).

{¶ 23} Absent an abuse of discretion, this court may not substitute its judgment for that of the trial court. *Pons v. Ohio State Med. Bd.*, 66 Ohio St.3d 619, 621 (1993). "It is to be expected that most instances of abuse of discretion will result in decisions that are simply unreasonable, rather than decisions that are unconscionable or arbitrary." *AAAA Ents., Inc. v. River Place Community Urban Redevelopment Corp.*, 50 Ohio St.3d 157, 161 (1990). "A decision is unreasonable if there is no sound reasoning process that would support that decision." *Id.* "It is not enough that the reviewing court, were it deciding the issue *de novo*, would not have found that reasoning process to be persuasive, perhaps in view of countervailing reasoning processes that would support a contrary result." *Id.*

16.

**{¶ 24}** Here, the trial court's decision not to award punitive damages was not unreasonable. This encounter took place during the height of the societal response to Covid, which the trial court recognized "caused people to do lots of different things that really they should have not concerned themselves with." Further, the trial court believed that Chester played a significant role in creating the conflict, and it expressed its understanding that Morris would be motivated to protect his granddaughters from what he perceived to be racial attacks, although it acknowledged there was no justification for Morris to shoot Chester. The trial court summed up the situation as "[l]ots of people acting bad." Considering the record, this court cannot say that the trial court's decision not to award punitive damages was an abuse of discretion.

**{¶ 25}** Accordingly, the Straleys' second assignment of error is not well-taken.

### IV. Conclusion

**{¶ 26}** For the foregoing reasons, the judgment of the Lucas County Court of Common Pleas is affirmed. The Straleys are ordered to pay the costs of this appeal pursuant to App.R. 24.

17.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Myron C. Duhart, J.

_____
JUDGE

Charles E. Sulek, J.
CONCUR.

_____
JUDGE

Christine E. Mayle, J.
DISSENTS AND WRITES
SEPARATELY.

**MAYLE, J.**

{¶ 27} I agree with the majority's disposition of the Straleys' second assignment of error, but I respectfully dissent as to the first assignment of error because the trial court's post-remand explanation for its damages award demonstrates that it committed an error of law by insisting on "specific figures" to support noneconomic damages.

{¶ 28} The assessment of noneconomic damages—pain and suffering, in particular—is "a matter solely for the determination of the trier of fact because there is no standard by which such pain and suffering may be measured." *Fantozzi v. Sandusky Cement Prod. Co.*, 64 Ohio St.3d 601, 612 (1992). "Since pain and suffering are subjective feelings," oftentimes "the injured person's testimony is the only direct proof of such damages." *Youssef v. Jones,* 77 Ohio App.3d 500, 505 (6th Dist. 1991). Other

18.

times, a plaintiff may present the testimony of lay witnesses familiar with the plaintiff who have observed "'marked changes in [his or her] emotional or habitual makeup,'" or physicians or therapists who have made diagnoses. *Burton v. Dutiel,* 2015-Ohio-4134, ¶ 70, 92 (5th Dist.), quoting *Powell v. Grant Medical Center,* 2002-Ohio-443, ¶ 16, 21 (10th Dist.).

{¶ 29} In this case, the Straleys presented Chester, Sue, and Dr. Davis's testimony to support their claim for noneconomic damages. The trial court made clear that it found Dr. Davis's testimony only "marginally compelling" and believed that Chester's condition and disposition predated the shooting. But it is also clear from the trial court's stated rationale for its damages award that it expected the Straleys to present evidence of past and future expenditures to support their claim for noneconomic damages:

- Importantly, however, Plaintiffs provided no evidence whatsoever detailing *any specific amount of damages* to which they may be entitled.

- Importantly, Plaintiffs did not establish through the testimony of Dr. Davis or otherwise *either the amount of money expended* on Dr. Davis' services, *nor any estimate of the amount of money they would need to expend* (if any) on future treatment.

- No evidence outlining the details of required treatment — *specifically, the cost thereof* — was presented by Plaintiffs.

- However, they fail to establish *with evidence any type of monetary figure* which may approximate the damages requested.

- Plaintiffs' counsel made what amounts to a bald ask of $600,000.00 and $300,000.00 in damages to Chester Straley and Sue Straley, respectively, and $500,000.00 in punitive damages, *but no information was presented evincing the basis for these figures*.

- However, Plaintiffs failed to present *evidence indicating the damages figures sought were tied in fact to the damages they actually sustained*.

- There is *no evidence of specific figures* from which to fashion a specific damages award, and Plaintiffs effectively ask the Court to speculate as to the full damages figure.

(Emphasis added.)

{¶ 30} "There is neither statutory [authority] nor case law requiring a plaintiff to quantify subjective damages such as pain and suffering." *Forman v. Kreps,* 2016-Ohio-1604, ¶ 49 (7th Dist.). Bills and invoices are not required. Because the trial court committed an error of law by insisting on "specific figures" to support noneconomic damages, I would reverse and remand this matter to the trial court with instructions that it limit its determination of noneconomic damages to assessing the weight and credibility of the evidence presented by the Straleys at the hearing without requiring proof of past or future expenditures.

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.